IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GAYLA J. ADAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-CV-32-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Claimant, Gayla J. Adams ("Adams"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Adams' application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Adams appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Adams was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

At the time of the hearing before the ALJ on February 12, 2007, Adams was 51 years old. (R. 350, 355). She had a GED. (R. 355). She had not worked since her asserted onset of disability on December 8, 2003. *Id.* She testified that although she had a valid driver's license, she did not drive due to her panic and anxiety. (R. 360). She testified that she had attempted to

1

work at a fast food restaurant taking orders on a computer, but she could only work two days before her hands were too numb to work on the third day. (R. 361-62).

Adams testified that she had chronic back pain that hurt in her waist area. (R. 362-63). She had been hospitalized in the week before the hearing, and an x-ray showed that she had a crushed vertebra at T-11. (R. 363). She had pain in her left hip and leg. (R. 364). At the second hearing, she said that she had developed a new symptom of difficulty with her neck when she moved her head, and her overall pain was worse. (R. 393-94). Adams testified that she could sit for about 10 or 15 minutes before needing to move. *Id.* She could stand for about 10 or 15 minutes. (R. 365). She could not carry groceries, such as a gallon of milk, up the stairs to her apartment. *Id.* This was due to back pain, but she also had problems with numbness in her fingers that had started when she was pregnant with her 12-year-old son. (R. 366). She suffered a work-related injury to her right wrist in 2004, but she did not get treatment through workers compensation, and she returned to work. *Id.* She testified that her doctor had told her she had arthritis in her shoulders. (R. 367). She suffered from migraines sometimes two to three times a week for about four hours, and she stayed still in a dark room. (R. 368). Her doctor had told her to take Lortab. *Id.* Adams testified that she had been diagnosed with hepatitis C. (R. 368-69). It made her tired and affected her digestive system. (R. 368-70). Her symptoms, including yellow coloring, had gotten worse in the three months before the hearing. (R. 370).

Adams described panic attacks in places like Wal-Mart, when she would feel that everybody was looking at her or talking about her, and she would have to leave quickly. (R. 371). Her treating physician, Dr. Wolfe, had prescribed Xanax for her panic attacks and anxiety. *Id.* Her niece did her grocery shopping for her. (R. 371-72). She preferred to be at home. (R.

2

372).  Her diagnosis of post-traumatic stress disorder ("PTSD") related to a rape in 2003.  (R. 373-74).

Adams cooked easy meals and used disposable dishes.  (R. 375).  She could not vacuum due to her back pain and her hand.  *Id.*  Her son helped her around the apartment, including doing and folding laundry.  (R. 376).  She testified that her social life was limited to church and that she did not visit friends.  (R. 377).

The records of Adams' treatment by Dr. Rudolph J. Wolf D.O. are hand-written notes on pre-printed forms.  (R. 146-208, 224, 46, 321-48).  Generally, there are no notes of the reasons for the visit or the results of examination.  *Id.*  Instead, there are hand-written notes in the sections labeled "Problems," "Impressions," "Diagnosis," or "Plans."  *Id.*  Many of the hand-written notes are not legible.  *Id.*  Additionally, it appears that a sheet was filled out for medication refills, when there was no physical examination.  *Id.*

On January 22, 2001, hepatitis C was listed as a problem, and there was accompanying lab work.  (R. 204, 206).  The condition was apparently discussed on February 20, 2001, and Xanax was prescribed.  (R. 203).  Adams was then seen by Dr. Wolf on several occasions for minor conditions or for refill of prescriptions.  (R. 191-202).  On June 21, 2002, the record states that Adams injured her right wrist at work and had swelling and inability to flex, as well as pain in her right elbow.  (R. 189).  The impression was tendonitis and it appears that she was told to splint the wrist and apply ice.  *Id.*  On July 3, 2002, the chief complaint was noted as numbness of right hand, the impression was tendonitis, and it appeared that she was referred for an electromyogram of her right arm and hand.  (R. 190).  On August 15, 2002, the impression was changed to carpal tunnel.  (R. 187).  On September 25, 2002, it appears that Adams was again referred for an electromyogram.  (R. 186).  From November 2002 to November 2003, Adams

3

was seen by Dr. Wolf several times for conditions unrelated to her claim for disability or for what appear to be routine visits for her prescriptions of Parzine and Xanax. (R. 171-85).

On January 6, 2004, Dr. Wolf wrote a note on his prescription pad stating that "[t]his 40 yr old female is 100% Temporarily Disabled due to Emotional Disorders." (R. 170). On that same date, the reason for visit was written as "many personal problems," and Dr. Wolf wrote anxiety and depression in the "Problems" section of the form. (R. 169). On March 3, 2004, Dr. Wolf wrote a type-written letter to the Osage County Housing Authority certifying that Adams was "currently 100% disabled due to a number of physical impairments." (R. 167). At an April 21, 2004, visit with Dr. Wolf, Adams complained that her carpal tunnel was worse in both wrists and that she was experiencing swelling. (R. 163). On June 30, 2004, carpel tunnel was one of the impressions listed on the form. (R. 162). On September 23, 2004, anxiety was one of the listed impressions. (R. 159). In October 2004, it appears that laboratory work was done and Adams was diagnosed with hypothyroid disorder and hyperlipemia. (R. 155).

Beginning in November 9, 2005, it appears that Dr. Wolf diagnosed Adams with chronic pain and that Lortab was prescribed, although the hand-writing is not completely clear. (R. 244). On December 6, 2005, Dr. Wolf noted anxiety as a diagnosis along with a second diagnosis that appears to be chronic pain, although it is not clear. (R. 243). On December 23, 2005, Adams complained of shoulder and finger pain, and the musculoskeletal examination noted pain and arthritis. (R. 240). On January 24, 2006[1], anxiety and hepatitis C were noted in the diagnosis section of the form, along, apparently, with chronic pain. (R. 239). Chronic pain was apparently included as a diagnosis, along with Lortab prescriptions in June and July 2006. (R. 234-35). On

---

[1] The record states 2005, but this appears to be a record from January 2006.

August 3, 2006, pain was included in the chief complaints, and the examination noted pain, arthritis, and apparently decreased range of motion, although this entry is not completely legible. (R. 233).

Dr. Wolf apparently saw Adams on several occasions in February, March, and April 2007 in relation to whiplash. (R. 334-48). A February 15, 2007 record indicates that physical examination revealed injury, pain, and stiffness, along with other notes that are not totally legible. (R. 347). This record also has the words "anxiety" and "stress" circled on the pre-printed form. *Id.* A record from May 15, 2007, appears to refer to a moving vehicle accident, and the examination revealed pain, stiffness and arthritis. (R. 330). There also appears to be a reference to spasm along the spine. *Id.* Records in June 2007 reflect that the examinations revealed injury and pain, as well as decreased range of motion along the cervical spine. (R. 327-28). An August 15, 2007 record showed no results of physical examination, but the diagnosis appears to be chronic pain. (R. 325).

A document included in the record indicates that Adams was treated at the emergency room at Saint Francis on January 11, 2006. (R. 247-58). It states that Adams had a panic attack and it mentions anxiety, stress, and non-specific chest pain. (R. 247-48).

A document is included in the record that shows that Adams was treated at Saint Francis Hospital at Broken Arrow on February 3, 2007, by Nathan Reusser, D.O. (R. 221-23). The document indicates that Adams was diagnosed with neck strain, and it mentions low back pain and head injury precautions, without definitively stating that Adams had either one of those conditions. (R. 221-22). The document stated that she had a crushed vertebra in her spine called a compression fracture, and the document appeared to indicate that this was an old injury. (R. 222). It stated that while this condition was painful, it was not serious, and Adams could

5

expect to recover fully within a few weeks. *Id.*

Adams was seen by agency consultant Gary R. Lee, M.D. for a comprehensive internal medicine examination on January 10, 2005. (R. 109-15). Dr. Lee listed the complaints as severe depression, anxiety, obesity, neck and back pain, pain in the upper extremities, hypercholesterolemia, and hypothyroidism. (R. 109). Dr. Lee noted that Adams moved slowly. (R. 110). His examination showed Adams' vision as 20/50 uncorrected. *Id.* The examination of the cervical and lumbar spines showed tenderness and reduced range of motion, although the thoracic spine was normal. *Id.* The examination of Adams' upper extremities shows full passive range of motion, with complaints of pain for extreme motion of the hands. *Id.* All joints showed normal range of motion. *Id.* The lower extremities were normal. (R. 111). The neurological examination was normal, although Dr. Lee again noted that Adams' gait was slow. *Id.* Dr. Lee noted Adams as "prominently depressed" and stated that she was tearful during part of the examination. *Id.* In the "Impression" section of his report, Dr. Lee stated that Adams' "examination, history and review of records are consistent with 1) Severe depression 2) Anxiety 3) Obesity 4) Neck and back pain 5) Pain in the upper extremities 6) Hypercholesterolemia 7) Hypothyroidism." *Id.*

Agency consultant Brian R. Snider, Ph. D. performed a mental status examination on February 10, 2005. (R. 116-20). He noted Adams' chief complaints of depression and anxiety and that her only care was from Dr. Wolf, who prescribed antidepressants and anti-anxiety medications. (R. 116). After reviewing Adams' history, Dr. Snider noted that Adams was tangential and tearful at times, her affect was restricted, and her mood was depressed. (R. 117, 119). She had a score of 30 out of 30 points on the Mini-Mental Status Exam. (R. 119). Dr. Snider assessed Adams' judgment and insight as fairly limited, and her memory and

concentration as mildly impaired. *Id.* On Axis I,[2] his diagnoses were major depressive disorder, single episode - mild, adjustment disorder with anxiety (in response to being raped), and alcohol dependence in full sustained remission. (R. 119-20). He assessed Adams' global assessment of functioning ("GAF") as 61. (R. 120). He recommended that she continue medication management and that she participate in individual and group therapy. *Id.* He stated that her prognosis was positive with adequate mental health care and if her chronic pain was reduced. *Id.*

Based on Dr. Lee's examination and report, on March 29, 2005, a non-examining agency consultant found that Adams' residual functional capacity ("RFC") was consistent with the full range of medium work. (R. 121-27).

Burnard L. Pearce, Ph.D., an agency non-examining consultant, completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on March 30, 2005. (R. 128-45). For Listing 12.04, Dr. Pearce noted Adams' diagnosis of major depressive disorder, single episode, mild. (R. 135). For the "Paragraph B Criteria,"[3] Dr. Pearce indicated that Adams had moderate restrictions of her activities of daily living, ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace. (R. 142). Dr. Pearce

---

[2]   The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[3]   There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

7

found no episodes of decompensation. *Id.* In the consultant's notes portion of the form, Dr. Pearce summarized Dr. Snider's examination and Adams' activities of daily living. (R. 144).

For the Mental Residual Functional Capacity Assessment, Dr. Pearce found that Adams was moderately limited in her ability to understand and remember detailed instructions, as well as her ability to carry out those instructions. (R. 128). Dr. Pearce found a marked limitation on Adams' ability to interact appropriately with the general public. (R. 129). Dr. Pearce stated that Adams could understand, remember, and carry out simple and some complex tasks under routine supervision. (R. 130). He found that she could relate superficially to coworkers and supervisors, but she could not tolerate active involvement with the general public. *Id.*

Agency consultant Dennis A. Rawlings, Ph.D. performed a second mental status examination on November 28, 2005. (R. 209-16). Adams presented her complaints as depression, anxiety, flashbacks, memory problems, alcoholism, drug dependency and sleep problems. (R. 210). Adams scored 29 of 30 on the Mini Mental Status Exam. (R. 212). On the REY 15-Item Test, Adams scored 9 of 15. (R. 213). Dr. Rawlings stated that a score of 8 or less on this test is suggestive of malingering. *Id.* Dr. Rawlings' Axis I diagnoses were major depressive disorder, recurrent, severe, without psychotic features, improved; panic disorder with agoraphobia; PTSD; adult physical, mental and sexual abuse victim; alcohol dependence - status unclear; and polysubstance dependence - status unclear. (R. 214). On Axis II, Dr. Rawlings diagnosed avoidant personality disorder with antisocial traits. *Id.* He assessed Adams' GAF as 50. (R. 215).

A psychological evaluation was conducted by David E. Hansen, Ph.D. on October 23, 2007. (R. 314-20). Dr. Hansen stated that Adams was markedly labile and quite tangential. (R. 314). He said that she described extreme pain, but appeared to sit comfortably in her chair

during the examination. (R. 315-16). She described having no mental health treatment other than the medications prescribed by Dr. Wolf and stated that she did not have money for that treatment. *Id.* Dr. Hansen said that Adams stated she was not aware of community mental health agencies. *Id.* Dr. Hansen described Adams' speech and behavior during the examination and stated that her presentation was "strongly suggestive of histrionic personality factors versus intentional embellishment of her symptoms." (R. 316). Adams scored 22 out of 30 on the Mini Mental Status Evaluation, but he questioned her effort and stated that her responses "suggested response bias." *Id.* In the section of his report for impressions, Dr. Hansen stated numerous times that the examination indicated "symptom embellishment," and he indicated that it was difficult to assess her true psychological symptoms due to response bias and embellishment. *Id.* His Axis I diagnoses were response bias; anxiety not otherwise specified; depression not otherwise specified; history of polysubstance abuse in sustained full remission, by report; along with a note to rule out pain disorder with both psychological and physiologic features. (R. 317). For Axis II, he made a provisional diagnosis of histrionic personality disorder. *Id.*

Dr. Wolf, Adams' treating physician, completed a Physical Residual Functional Capacity Assessment on February 19, 2007. (R. 259-66). For Adams' exertional limitations, Dr. Wolf indicated that she could not perform sedentary work, and he listed chronic pain and anxiety as the reasons. (R. 260). For postural limitations, Dr. Wolf stated that Adams could never climb, balance, stoop, kneel, crouch, or crawl, and apparently indicated that this was due to chronic pain. (R. 261). For manipulative limitations, he said that reaching, handling, fingering, and feeling were all limited due to chronic pain. (R. 262). He found no visual or communicative limitations. (R. 262-63). He indicated that Adams should avoid moderate exposure to wetness and humidity and should avoid all exposure to extreme cold or heat, noise, vibration, fumes and

9

hazards, due to chronic pain. (R. 263). He added that Adams was under great mental distress (or the word could possibly be "duress") and chronic pain and anxiety. (R. 264).

In addition, Dr. Wolf wrote a letter to Adams' attorney dated March 3, 2008. (R. 349). His letter is in response to a letter from Adams' attorney, and the Court has been unable to find a copy of that letter in the record, and thus it is not possible to understand the context of Dr. Wolf's responses. The letter appears to state that Adams had residual conditions from a motor vehicle accident "with musculoskeletal complications." *Id.* It also refers to chronic pain, emotional issues, and chronic staphylococcus aureus cutaneous infections. *Id.* It indicates that Adams' condition was stable, but she would require treatment for life. *Id.* It states that Adams "is 100% permanently disabled to the body as a whole as a result of her physical and emotional disabilities, and is unemployable due to the above." *Id.*

## Procedural History

On October 8, 2004, Adams filed applications for disability insurance benefits and supplemental security income under Title II, 42 U.S.C. § 401 *et seq.*, (R. 268-70). In these applications, Adams alleged disability beginning December 8, 2003. Adams' applications for benefits were denied in their entirety initially and on reconsideration. (R. 37-39, 41-44, 272-75, 277-79). A hearing before ALJ Lantz McClain was held February 12, 2007 in Tulsa, Oklahoma. (R. 350-86). By decision dated May 24, 2007, the ALJ found that Adams was not disabled at any time through the date of the decision. (R. 280-91). On September 13, 2007, the Appeals Council issued an order remanding the case to the ALJ. (R. 302-05).

A second hearing was held February 25, 2008. (R. 387-403). By decision dated April 23, 2008, the ALJ again found that Adams was not disabled at any time through the date of the decision. (R. 17-27). On November 24, 2008, the Appeals Council denied review of the ALJ's

10

findings. (R. 6-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

---

[4]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Adams met insured status through December 31, 2008. (R. 19). At Step One, the ALJ found that Adams had not engaged in any substantial gainful activity since her alleged onset date of December 8, 2003. *Id.* At Step Two, the ALJ found that Adams had severe impairments of obesity, depression, and anxiety. *Id.* The ALJ discussed Adams' complaint of hand numbness and concluded that it was non-severe. (R. 20). He also discussed Adams' complaints regarding pain and migraines, and he concluded that they were not medically determinable impairments because they were not established by the medical evidence. *Id.* At Step Three, the ALJ found that Adams' impairments did not meet any Listing. *Id.*

The ALJ determined that Adams had the RFC to do medium work "except she is limited to simple/repetitive tasks and incidental contact with the public." (R. 21). At Step Four, the ALJ found that Adams could not return to past work. (R. 26). At Step Five, the ALJ found that there were jobs that a person with Adams' RFC could perform. *Id.* Therefore, the ALJ found that Adams was not disabled at any time through the date of his decision. (R. 27).

## Review

Adams asserts that the ALJ erred in his consideration of the opinion evidence of Dr. Wolf and in his credibility assessment. The undersigned finds that substantial evidence supports the ALJ's decision in these two respects, and the decision complies with legal requirements. Therefore, the ALJ's decision is affirmed.

### Opinion Evidence

Adams raises several issues regarding the ALJ's treatment of the opinion evidence of Dr. Wolf. A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

In the present case, it is clear that the ALJ completely rejected the medical opinion of Dr. Wolf given in the Physical Residual Functional Capacity Assessment dated February 19, 2007, as well as the March 3, 2004 letter to the Osage County Housing Authority and the letter to Adams' attorney dated March 3, 2008.[5] (R. 23-25, 167, 259-66, 349). The undersigned finds that the ALJ gave adequate specific legitimate reasons for rejecting this treating physician evidence. *See White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001) (Tenth Circuit would not reweigh evidence when the ALJ's discounting of treating physician's opinion was based on legitimate factors such as lack of objective medical evidence supporting treating physician's opinion, inconsistencies in the treating physician's records, and the relatively brief length of the doctor-patient relationship); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (no error where ALJ "provided good reasons in his decision for the weight he gave to the treating sources' opinions").

Regarding the letter to the Osage County Housing Authority, the ALJ correctly stated that this opinion was in the form of a conclusion with no reference to specific physical impairments and no reference at all to mental impairments. (R. 23, 167). Such a conclusion by a treating physician is not a true treating physician opinion, and the ALJ was not required to weigh it as such. *See Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008). The Tenth Circuit in *Cowan* explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Id.* at 1189. Thus, the court found that a

---

[5]     The ALJ mistakenly referred to this letter as the January 15, 2008 letter. (R. 25). The letter is actually dated March 3, 2008, but it states that it is a reply to a January 15, 2008 letter from Adams' attorney. *Id.*

14

statement by the treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations).

Although the ALJ was not required to discuss the Osage County Housing Authority letter as a true treating physician opinion, he also stated that it was not clear that Dr. Wolf's definition of "disability" in the letter was consistent with the Social Security definition of disability. (R. 23). This was a legitimate factor for the ALJ to discuss. *See, e.g., Seever v. Barnhart*, 188 Fed. Appx. 747, 753 (10th Cir. 2006) (unpublished) (legitimate to discount opinion given in workers' compensation context given difference in meaning of terms); *Jones v. Barnhart*, 53 Fed. Appx. 45, 47 (10th Cir. 2002) (unpublished) (same). The ALJ also stated that this opinion contrasted sharply with Dr. Wolf's own treatment records. (R. 23-24). Having reviewed the treating records of Dr. Wolf, the undersigned agrees with this assessment of the ALJ. The treating records of Dr. Wolf, especially up to the March 3, 2004 letter to the Osage County Housing Authority, simply do not reveal a treating history that would be consistent with a finding of 100% disability. (R. 167-206).

The ALJ discussed the Physical Residual Functional Capacity Assessment and the March 3, 2008 letter in the same paragraph of his decision. (R. 25). Only the first was a true treating physician opinion in the sense that it addressed Dr. Wolf's judgment about the nature and severity of Adams' physical limitations. *Cowan,* 552 F.3d at 1188-89. The March 3, 2008 letter

15

was a summary conclusion with little explanation of why Dr. Wolf believed that Adams was "100 % permanently disabled to the body as a whole as a result of her physical and emotional disabilities, and is unemployable due to the above." (R. 349). Because it was not a true treating physician opinion, the ALJ was not obligated to explain why he rejected it. The ALJ, however, did address it and primarily discussed the indications that the definition of disability that Dr. Wolf used may not have been the definition of disability in the Social Security context. The undersigned agrees with the ALJ that the language of the letter is similar to that of the workers' compensation context, but in any case, because it was not a true treating physician opinion, the ALJ's decision adequately addressed the March 3, 2008 letter.

Regarding the Physical Residual Functional Capacity Assessment completed by Dr. Wolf, the ALJ rejected the opinions given by Dr. Wolf. The ALJ's primary two reasons for rejecting that opinion were that it was inconsistent with Dr. Wolf's own treatment records and it was not consistent with the other medical evidence. (R. 20, 25). The lack of substantiating objective medical evidence was clearly a legitimate reason for the ALJ to reject Dr. Wolf's opinion. *White*, 287 F.3d at 907-908. In finding that Adams' chronic pain and migraines were not severe impairments at Step Two, the ALJ specifically noted that "[a]fter a thorough review of the evidence, no treatment records, radiology reports, physical therapy records or medication logs were found supporting these claims." (R. 20). While Dr. Wolf did include a diagnosis of chronic pain beginning in November 2005, there is little objective support of this diagnosis. Dr. Wolf's records often contain no indication that a physical examination was done, and he did not refer Adams for any kind of diagnostic testing or for any more specialized treatment of her

chronic pain. His only treatment appeared to be prescribing Lortab.[6] As the ALJ noted, Dr. Wolf's extreme opinions regarding Adams' RFC were not supported by any of the other evidence of record. The ALJ gave adequate reasons for rejecting the opinions of Dr. Wolf, and the decision is therefore affirmed.

**Credibility Determination**

Adams raises several complaints regarding the ALJ's credibility analysis, but the undersigned concludes that the ALJ's discussion and analysis in his decision were adequate. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ gave several specific reasons for his finding that Adams lacked credibility. First, in rejecting her claim of chronic pain and migraines, he found that there was no objective medical evidence supporting those impairments, and he found them not medically determinable

---

[6] In this discussion, it is not the intent of the undersigned to engage in a *post hoc* rationalization of the ALJ's decision. *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). The ALJ's decision articulates that one reason for his decision was the lack of medical records supporting Dr. Wolf's extreme conclusions regarding Adams' RFC. (R. 20, 23-25). This Opinion and Order has not created a substitute rationale for upholding the ALJ's decision, but has merely explained the rationale given by the ALJ. *See, e.g., Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008) (unpublished).

at Step Two. (R. 20). He also reviewed all of the opinion evidence, including Dr. Hansen's report that strongly indicated embellishment on Adams' part. (R. 24). He noted that Adams had never received any mental health treatment other than the medications prescribed by Dr. Wolf. The failure to seek[7] medical treatment is a legitimate point in a credibility assessment. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000). Finally, he found that Adams' work history before her alleged date of onset was sporadic, and the undersigned agrees that this is a legitimate factor tending to undermine a claimant's credibility. *Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) (no error for ALJ to consider that the claimant quit working years before alleged onset of disability, *citing* SSR 88-13); *Watson v. Barnhart*, 193 Fed. Appx. 526, 530-31 (10th Cir. 2006) (unpublished) (claimant's lack of employment for a large portion of 15 years constituted substantial evidence supporting ALJ's characterization of her work history as weak, which was a legitimate factor in assessing credibility). The ALJ's credibility determination was therefore supported by specific reasons linked to substantial evidence, and it will be affirmed.

The affirming of the ALJ's credibility assessment comes in spite of the ALJ's improper references to Adams' reported limited activities of daily living. (R. 26). This paragraph of the

---

[7] The ALJ included a citation to *Teter v. Heckler*, 775 F.2d 1104 (10th Cir. 1985) for the proposition that Adams "has provided no evidence that she has sought and been denied medical treatment from her treating sources or from indigent care facilities run by various government agencies." (R. 24). The undersigned finds *Teter* to be an inapplicable authority for this proposition, because it deals with a situation where a claimant was refused disability benefits in part because he had refused to have surgery, and the Tenth Circuit found his refusal not to be unjustified partly because he could not afford it. *Id*. at 1107. In spite of the undersigned's criticism of the citation of *Teter,* the principle that the ALJ was entitled to note the attempts of the claimant to obtain treatment in making his credibility assessment is legitimate one, as noted in *Qualls*, cited in the main text of this Opinion. In the present case, it appears to be uncontroverted that Adams made no attempts to obtain treatment of her depression or anxiety, beyond the medications Dr. Wolf prescribed, and this failure to seek treatment undermines Adams' contention that these mental conditions were disabling, regardless of Adams' financial status.

ALJ decision is a boilerplate provision that has been criticized and rejected by the Tenth Circuit. *Swanson v. Barnhart*, 190 Fed. Appx. 655, 657-58 (10th Cir. 2006) (unpublished). The Tenth Circuit said the language did not comply with the requirement that the ALJ must cite to substantial evidence that is closely and affirmatively linked to the issue of credibility. *Id.* The undersigned agrees with the Tenth Circuit's criticism that the terms "other reasons," "other factors," and "relatively weak," are "boilerplate" terms that "[fail] to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that [the claimant's] complaints were not credible." *Id.* at 658, *quoting Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

However, the inclusion of inapplicable or improper language in the decision does not mean that the ALJ's credibility analysis is fatally flawed. The Tenth Circuit has come to similar conclusions, stating in one case that it had "some concerns" with the ALJ's reliance on the claimant's failure to follow a weight loss plan and the claimant's performance of minimal household chores. *Branum v. Barnhart,* 385 F.3d 1268, 1274 (10th Cir. 2004). In spite of those concerns, the Tenth Circuit nevertheless affirmed the credibility finding because of other, legitimate factors cited by the ALJ. *Id. See also Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007) (while ALJ's statement of "large variations" in tests was incorrect, there was still substantial evidence supporting his finding of tests' invalidity); *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points). After omitting the cited improper boilerplate provision, the ALJ's credibility determination was supported by substantial evidence and was in compliance with the legal requirements.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 26th day of March, 2010.

_____
Paul J. Cleary
United States Magistrate Judge